[Civ. No. 49094. First Dist., Div. One. June 29, 1981.]

CAROL KIZZIAH, Plaintiff and Respondent, v.
DEPARTMENT OF TRANSPORTATION et al.,
Defendants and Appellants.

COUNSEL

Richard G. Rypinski, John B. Matheny, Charles E. Spencer, Jr., and Charles P. Valdes for Defendants and Appellants.

Russell Bruno for Plaintiff and Respondent.

OPINION

RANCANELLI, P. J.—On appeal from an adverse judgment below, appellants, Department of Transportation of the State of California and Adriana Gianturco, Director of Transportation (hereafter DOT),[1] we consider an issue of first impression: whether legislation authorizing the DOT to annually apportion to local government agencies revenue derived from leased lands acquired for future highway purpose and providing for credit allowance or refunds offsetting lessees' payment of local possessory interest taxes is facially invalid under the provisions of California Constitution, article XVI, section 6, and article XIX, sections 1 through 3. Since no factual issues were litigated, the question is solely a matter of law.[2]

### Background

Respondent Carol Kizziah, purportedly acting as private attorney general on behalf of the people of the State of California, brought an action for declaratory and injunctive relief against the DOT challenging the constitutionality of sections 104.10 and 104.13 of the Streets and Highways Code (to which all statutory references herein apply unless otherwise indicated) seeking to enjoin the disbursement of funds pursuant to said sections, together with an award of attorney fees. Following submission of briefs and oral argument, the trial court entered a judgment invalidating both sections. The judgment 1) permanently enjoins any further implementation of the challenged sections, 2) mandates the DOT to recover and restore to the State Highway Account all disbursements made from and after the date of service of summons and com-

---

[1]The acronym reference is intended to include the director, whose interests appear identical to the Department of Transportation.

[2]The parties so stipulated below including other stipulations relating to the magnitude of revenue allocations, credits and refunds.

plaint, and 3) retains jurisdiction to consider any further orders and the question of requested attorney fees.

The validity of the challenged statutes rests upon a determination of the following questions: 1) Whether section 104.10 provides for the allocation of revenues in a manner inconsistent with the constitutional mandate (Cal. Const., art. XIX, § 3) and unlawfully delegates an exclusive legislative function to local governmental agencies; and 2) whether related section 104.13 providing for a system of credits and refunds sanctions an unconstitutional gift of public funds (Cal. Const., art. XVI, § 6) or conflicts with the governing constitutional provisions (Cal. Const., art. XIX, §§ 1-3) reproduced below.[3]

---

[3]Relevant parts of article XIX reads as follows: Section 1. "Revenues from taxes imposed by the state on motor vehicle fuels for use in motor vehicles upon public streets and highways, over and above the costs of collection and any refunds authorized by law, shall be used for the following purposes: [¶] (a) The research, planning, construction, improvement, maintenance, and operation of public streets and highways (and their related public facilities for nonmotorized traffic), including the mitigation of their environmental effects, the payment for property taken or damaged for such purposes, and the administrative costs necessarily incurred in the foregoing purposes. [¶] (b) The research, planning, construction, and improvement of exclusive public mass transit guideways (and their related fixed facilities), including the mitigation of their environmental effects, the payment for property taken or damaged for such purposes, the administrative costs necessarily incurred in the foregoing purposes, and the maintenance of the structures and the immediate right-of-way for the public mass transit guideways, but excluding the maintenance and operating costs for mass transit power systems and mass transit passenger facilities, vehicles, equipment, and services."

Section 2. "Revenues from fees and taxes imposed by the state upon vehicles or their use or operation, over and above the costs of collection and any refunds authorized by law, shall be used for the following purposes: [¶] (a) The state administration and enforcement of laws regulating the use, operation, or registration of vehicles used upon the public streets and highways of this state, including the enforcement of traffic and vehicle laws by state agencies and the mitigation of the environmental effects of motor vehicle operation due to air and sound emissions. [¶] (b) The purposes specified in Section 1 of this article."

Section 3. "The Legislature shall provide for the allocation of the revenues to be used for the purposes specified in Section 1 of this article in a manner which ensures the continuance of existing statutory allocation formulas for cities, counties, and areas of the state, until it determines that another basis for an equitable, geographical, and jurisdictional distribution exists; provided that, until such determination is made, any use of such revenues for purposes specified in subdivision (b) of Section 1 of this article by or in a city, county, or area of the state shall be included within the existing statutory allocations to, or for expenditure in, that city, county, or area. Any future statutory revisions shall provide for the allocation of these revenues, together with other similar revenues, in a manner which gives equal consideration to the transportation needs of all areas of the state and all segments of the population consistent with the orderly achievement of the adopted local, regional, and statewide goals for ground transportation in local general plans, regional transportation plans, and the California Transportation Plan."

*Historical Perspective*

Since the 1938 enactment of California Constitution article XXVI (repealed in June 1974; replaced by art. XIX, as amended) the use of revenue derived through the imposition of motor vehicle fuel taxes and license fees and taxes has been expressly limited to the construction and maintenance of public streets and highways and enforcement of vehicle regulations (former Cal. Const., art. XXVI, §§ 1-2; see 20 Ops.Cal. Atty. Gen. 224 (1952)). Under the earlier constitutional provision, the Legislature was expressly empowered to appropriate such revenue for expenditure by state and local governments for the specified purposes and "to enact legislation not in conflict with this article." (Former Cal. Const., art. XXVI, § 3.)

In 1939 section 104.6 was enacted conferring authority on the Department of Public Works, the predecessor agency to DOT, which included authority to lease lands acquired for future highway needs. (The proviso that 24 percent of rents received be deposited in the Highway Properties Rental Fund (now State Highway Account) was added by later amendment. (Stats. 1959, ch. 2157, § 1; Stats. 1961, ch. 1260, § 1.)) Beginning in 1947, the Legislature extensively implemented its constitutional grant through a series of enactments establishing detailed formula apportioning net revenues derived from fuel taxes on deposit in the Highway Users Tax Fund (now Highway Users Tax Account) for expenditure by the recipient cities, counties and state regions (see generally, §§ 180 et seq., 2100 et seq.). Fuel and license tax revenues previously deposited in the Motor Vehicle Fuel Fund (see Rev. & Tax. Code, §§ 8351, 9301)—after allowance for designated refunds and administrative expense—were appropriated to the Highway Users Tax Fund. (See Rev. & Tax. Code, former §§ 8352-8353, 9302-9304.) In 1959 the former version of section 104.10 was enacted authorizing the payment of rents deposited in the Highway Properties Rental Fund to the county in which the leased real property was situated for proportionate distribution to each revenue district and taxing agency in the manner certified by the county auditor and approved by the board of supervisors. In 1971 the various state funds were renamed and redesignated as individual accounts included within a newly established Transportation Tax Fund. (Rev. & Tax. Code, § 8351.)[4]

---

[4]The Motor Vehicle Fuel Fund became the Motor Vehicle Fuel Account of the Transportation Tax Fund (Rev. & Tax. Code, §§ 8351, 9301); the Highway Users Tax Fund became the Highway Users Tax Account (Rev. & Tax. Code, §§ 8353,

In 1974 Constitution, article XXVI was repealed and substantially reenacted (renumbered as art. XIX in 1976) in an expanded version reflecting environmental concerns (Cal. Const., art. XIX, § 1, subd. (a), § 2, subd. (a)) and providing for the research and development of exclusive public mass transit systems (Cal. Const., art. XIX, § 1, subd. (b)) subject to specified voter approval (Cal. Const., art. XIX, § 4). As revised, section 3 now requires that the legislative allocation of revenues ensure "the continuance of existing statutory allocation formulas for cities, counties, and areas of the state" until another basis for equitable geographical and jurisdictional distribution is determined to exist. Moreover, future statutory revisions must provide for the allocation in a manner giving "equal consideration to the transportation needs of all areas of the state and all segments of the population" compatible with local, regional and statewide transportation plans. (Cal. Const., art. XIX, § 3.) That same year the original version of section 104.13 was enacted, arguably in an attempt to equalize the burden imposed upon section 104.6 lessees for local possessory interest taxes and to eliminate the double taxation benefits which would otherwise inure to the local governmental agency, i.e., possessory interest tax receipts and statutory allocation of rental revenues.[5]

As we later discuss, section 104.13 effectively neutralizes the apparent effect of such double payment by offsetting statutory allocation payments in an amount equivalent to future rent credits or refunds paid.

---

9302-9304); the Highway Properties Rental Fund became the Highway Properties Rental Account (§ 104.6). The State Highway Fund became the State Highway Account of the State Transportation Fund. (Sts. & Hy. Code, § 182). The redesignated State Highway Account was deemed to include the Highway Property Rental Fund or Highway Properties Rental Account. (§§ 104.6, 104.10, 104.13, amended by Stats. 1978, ch. 389, §§ 1-3.)

[5]Without benefit of either legislative history or record reference, the parties offer differing reasons for the enactment of related section 104.10. The DOT theorizes that the companion section represents a legislative recognition of an obligation to compensate local governmental entities providing services to the leased properties otherwise exempt from local taxation; thus, it is argued, local governments levying possessory interest taxes would receive a dual monetary benefit through such "double taxation" for the same services, an inequity intended to be remedied through rental adjustments coupled with offsetting revenue deductions as provided under section 104.13 (discussed *infra*). In contrast, respondent contends that the underlying purpose of the statutory allocation is to compensate local entities for the loss of revenue resulting from the removal of state-acquired properties from the tax rolls. However, respondent tacitly rejects the double taxation theory in mounting her multiple constitutional challenges to both sections.

As a result of earlier litigation instituted by respondent's present counsel in pro per against the State Director of Finance and the Controller in which the DOT was neither named nor appeared as a party (Bruno v. Bell, et al (Super. Ct. Alameda Co., No. 463863-4), former section 104.10 was found constitutionally infirm in providing for the blanket expenditure of allocated rent revenues "for any proper state purpose not prohibited by the State Constitution." The judgment voiding the challenged statute was permitted to become final without appeal.[6] Thereafter, the present version of section 104.10 was enacted as an urgency measure on July 11, 1978, "[I]n order to conform to that [superior court] decision and to continue without delay the allocation of 24 percent of the State Highway Property rental income to the counties, ..." (Stats. 1978, ch. 389, § 4.) On November 16, 1978, the underlying action was instituted renewing the constitutional challenges to both revised section 104.10 and section 104.13 as amended. Following submission of the cause, the same trial judge upheld the challenges on the basis that the statutes violated the express mandate of Constitution, article XIX; additionally, section 104.13 was determined to be facially defective under the provisions of Constitution, article XVI, section 6, prohibiting the gift of public funds.

## Discussion

A constitutional attack on the validity of the legislative enactments invokes basic principles of constitutional construction: legislation is presumptively constitutional and all doubts are to be resolved in favor of its validity. (*American Motorists Ins. Co.* v. *Starnes* (1976) 425 U.S. 637 [48 L.Ed.2d 263, 965 S.Ct. 1800]; *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193] (and cases there cited); *Bowker* v. *Baker* (1946) 73 Cal. App.2d 653, 657 [167 P.2d 256].) It is axiomatic that the challenged legislation must be sustained whenever it is susceptible of a reasonable interpretation consistent with controlling constitutional provisions. (*Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497, 505 [134 Cal. Rptr. 668, 556 P.2d 1119]; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669], cert. den. 401 U.S. 1012 [28 L.Ed.2d 549, 91 S.Ct. 1266]; *People v. Davis* (1968) 68 Cal.2d 481, 483-484 [67 Cal.Rptr. 547, 439 P.2d 651].)

---

[6]An appeal was perfected only from that portion of the judgment awarding attorney fees; this court reversed, finding the award of attorney fees to be contrary to public policy. (See *Bruno* v. *Bell* (1979) 91 Cal.App.3d 776 [154 Cal.Rptr. 435].)

With those precepts in mind, we consider the facial validity of the challenged statutes.

I

*Section 104.10*

■ Under the provisions of the statute, as amended, the DOT is directed to "pay the rents computed pursuant to Section 104.6 to the county in which such real property is situated." (§ 104.10)[7] Ratable distribution of the proceeds received is determined by the local board of supervisors except that one-half must be allocated to the situs municipality. The main theme of respondent's argument below and renewed on appeal is that notwithstanding the 1978 amendment restricting the expenditure of allocated rental revenues to "purposes authorized by article XIX of the California Constitution." (§ 104.10.), such revenues have never been "allocated" to cities, counties and state regions inasmuch as the source of rental revenue is generated by state-acquired property purchased with state funds. Thus, under the thesis urged, compliance with the constitutional mandate that legislation dealing with the allocation of revenues for authorized purposes continue the "existing statutory allocation formulas" (art. XIX, § 3) logically impels a conclusion that such allocations be made to the DOT and not "allocated" to local government agencies. Moreover, the argument continues, the statutory language authorizing payment distribution of such rental revenue to local taxing agencies "in the amount as determined by the board of supervisors" flouts the nondelegable constitutional duty imposed upon the Legislature to "provide for the allocation of the revenues ... [including] future statutory revisions ... in a manner which gives equal consideration" to other designated transportation needs. (Cal. Const., art. XIX, § 3; cf. *Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].) Such convoluted arguments are woefully wide of their mark.

---

[7]Section 104.10 reads as follows: "The Department of Transportation shall, not later than the first day of November following the close of any fiscal year, pay the rents computed pursuant to Section 104.6 to the county in which such real property is situated. The Department of Transportation shall certify to the Department of Finance the amount of such rentals attributable to each county and shall notify each county of the rental and location of each piece of rental property for which rents are deposited in the State Highway Account in the State Transportation Fund. [¶] The county auditor shall distribute any payment received by the county pursuant to this section, to the county, to each revenue district for which the county assesses and collects real property taxes or assessments, and to every other taxing agency within the county in which the property

Of foremost significance, the constitutional restriction on the use of revenues is limited to "[r]evenues from *taxes imposed* by the state on *motor vehicle fuels*" (Cal. Const., art. XIX, § 1) and "revenues from *fees and taxes imposed . . .* upon *vehicles or their use . . . .*" (art. XIX, § 2; italics added.) The revenue allocated pursuant to the statute is derived solely from the leasing of lands held for future highway needs, a purpose implicitly sanctioned by section 1 of article XIX. Such a reasonable construction does no violence to any constitutional design. The constitutional purpose is faithfully served whenever restricted tax revenues are used to acquire real property for future highway needs. Respondent neither suggests nor are we aware of any legal authority or countervailing policy considerations which would prohibit either the productive use of such acquired lands pending future needs or the legislative allocation of a portion of the generated rentals to local governmental agencies for permissibly related uses.

In any event, section 104.10 does not represent new "future statutory revision[s]" requiring an allocation scheme reflecting local and statewide transportation needs and goals as now mandated by article XIX, section 3 of the California Constitution. Apart from certain technical changes previously noted, the 1978 legislative amendments effected no substantive changes in the statutory allocation formula within the meaning of the second sentence of section 3. To the contrary, the exact statutory allocation formula providing that 24 percent of the rental revenues be set aside for local distribution remains intact as originally enacted some 20 years earlier. The major change (in response to the earlier adjudication of invalidity based upon the then unrestricted disbursement of the trust revenues) related to the authorized *use* of such money as distinguished from its *allocation.* Indeed, the Legislature's urgency declaration that the existing statutory allocation of the 24 percent be maintained demonstrates its unmistakable intention to continue such existing statutory formula, at least until a different basis of distribution is ultimately determined as provided under the first sentence of section 3.

Nor does the grant of authority thereunder to the local board of supervisors to determine the amount to be distributed among the assess-

is situated in the amount as determined by the board of supervisors, except that one-half of the allocation for a rental property shall be allocated to the city in which the rental property is located. [¶] As used in this section, the terms 'taxing agency' and 'revenue district' have the same meanings given them in the Revenue and Taxation Code. The money received by the respective jurisdictions under this section shall be expended only for purposes authorized by Article XIX of the California Constitution."

ing revenue districts and taxing agencies manifest an abdication of constitutional responsibility as contended. The duty imposed upon the Legislature to provide for the allocation of the fuel tax revenues is fully discharged in providing that the required allocation of 24 percent of such revenues be apportioned "one-half . . . to the city in which the real property is located" (§ 104.10), and—by implication—the other half being subject to board-determined pro tanto distribution. Thus, the legislation was clearly responsive to the constitutional mandate; the fact that the allocation scheme permits further apportionment among the local taxing entities does not manifest an unconstitutional delegation of legislative authority.

II

*Section 104.13*

██ Under the provisions of section 104.13, as amended,[8] a lessee is entitled to apply for a credit against future rental payments or a refund of prior rental payments in an amount equal to the possessory interest tax imposed upon the lessee for that year.[9] The statute further provides that such credits or refunds shall be deducted "from the payments made pursuant to section 104.10 . . . ." (§ 104.13, subd. (b).) As earlier noted, the trial court determined that the statute was facially defective under the provisions prohibiting a gift of public funds (Cal. Const., art.

---

[8]Section 104.13 reads as follows: "(a) Any person leasing real property from the department may, in any year, apply to the department for a credit against future rental payments on the property, or for a refund from the State Highway Account in the State Transportation Fund if the person is no longer leasing the property, upon submission of evidence to the department that the person had paid the tax imposed for that year for the person's possessory interest in the property. [¶] (b) The credit or the refund, as the case may be, shall be deducted from the payments made pursuant to Section 104.10 to the county in which the property is located. [¶] (c) The department shall report the amount of credit and refund granted pursuant to subdivision (a) in each county during the prior fiscal year to the Department of Finance by October 1. [¶] (d) The credit and refund authorized shall be applicable to all taxes paid on or after January 1, 1975, for the possessory interest in real property leased by the department. [¶] (e) This section shall apply only to real property held for future state highway needs and to real property originally held for that purpose, which the department has determined is no longer needed therefor, prior to its sale or exchange by the department."

[9]By providing that credit or refund shall apply only to "taxes paid on or after January 1, 1975, . . ." (§ 104.13, subd. (d)), the statute, as amended, avoids any claim of improper retroactive cancellation of taxes. (*Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55, 66 [338 P.2d 440]; *Estate of Skinker* (1956) 47 Cal.2d 290, 296 [303 P.2d 745, 62 A.L.R.2d 1137]; *Estate of Cooke* (1976) 57 Cal.App.3d 595, 602 [129 Cal.Rptr. 354].)

XVI, § 6)[10] and the restrictions imposed upon the use of fuel tax revenues (Cal. Const., art. XIX). The DOT renews its argument below that the challenged statute is invulnerable to a facial attack since its remedial purpose to relieve its lessee from inequitable "double taxation" falls within the public purpose exception. It further contends that the legislation simply permits appropriate reductions in the rental rates charged compatible with competitive market considerations and thus represents a necessary administrative cost (see Cal. Const., art. XIX, § 1, subds. (a), (b)) in implementing the constitutionally authorized purposes.

The crucial inquiry is whether the authorized credit or refund equivalent to the amount of possessory interest tax imposed fulfills a public purpose excepted from the reach of the constitutional prohibition. ▮ "It is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be used for a 'public' or a 'private' purpose. If they are for a 'public purpose,' they are not a gift within the meaning of section 31 of article IV. [Now § 6 of art. XVI.] [Citations omitted.] The benefit to the state from an expenditure for a 'public purpose' is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. [Citation omitted.] [¶] The determination of what constitutes a public purpose is primarily a matter for legislative discretion [citations omitted], which is not disturbed by the courts so long as it has a reasonable basis. [Citations omitted.]" (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141], see also *California Housing Finance Agency v. Elliott, supra,* 17 Cal.3d 575, 583; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d 953], app. dism. 406 U.S. 913 [32 L.Ed.2d 112, 92 S.Ct. 1762]; *Redevelopment Agency v. Shepard* (1977) 75 Cal.App.3d 453, 457 [142 Cal.Rptr. 212].) Moreover, "[t]he concept of public purpose has been liberally construed by the courts, and the Legislature's determination will be upheld unless it is totally arbitrary." (*Mannheim v. Superior Court* (1970) 3 Cal.3d 678, 691 [91 Cal.Rptr. 585, 478 P.2d 17].)

▮ Placing its primary reliance on this body of precedents, the DOT asserts that the credit and refund scheme serves a legitimate pub-

---

[10]California Constitution, article XVI, section 6 provides, in pertinent part, as follows: "The Legislature shall have no power ... to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever; ..."

lic purpose in eliminating the double benefit otherwise accruing to the recipient county, i.e., the annual payments pursuant to section 104.10 and the local possessory interest tax payment by the affected lessee. Without such equalizing adjustment, it is argued, the DOT would be relegated to an unfavorable market position in leasing lands held for future uses since the additional local tax burden might result in economic disadvantages through the inability to attract potential lessees at competitive rental rates; thus, the argument continues, such foreseeable disadvantages could cause many of the properties reserved for future use to lie fallow and unproductive. Assuming, arguendo, the merit of that debatable prophesy, the DOT fails to demonstrate—or even argue—why the same beneficial purpose could not be achieved simply by deducting from the county's annual payment an amount equal to the possessory interest tax paid without the tandem provision for a credit or refund to its private lessee.

 We recognize that any claim of an unlawful gift of public funds is refuted if the consideration given is adequate so as to evidence a bona fide contract (*Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834 [108 Cal.Rptr. 415]; cf., *Cane* v. *City and County of San Francisco* (1978) 78 Cal.App.3d 654 [144 Cal.Rptr. 316]); and further, that a public expenditure will be deemed supported by an adequate consideration if there is a public purpose served notwithstanding that private persons will benefit therefrom. (See *California Housing Finance Agency* v. *Elliott, supra*, 17 Cal.3d 575, 583.) But while we must accord great respect to a legislative determination of public purpose, in the context of the issue presented herein the question of whether adequate consideration exists in the form of a valid public purpose served or through competitively negotiated rental agreements between the DOT and its lessees, so as to justify a conclusion that rental adjustments are necessitated in order to achieve the primary constitutional objectives, will ordinarily present a question of fact for the trial court. (Cf. *Winkelman* v. *City of Tiburon, supra*, at p. 854.) Since the challenged statute is clothed with a presumption of constitutional validity, we cannot say that the legislation on its face fails to serve a valid public purpose so as to be subject to unconstitutional taint. Stated differently, if it were factually demonstrated that the statutory scheme as applied results in the receipt of adequate consideration under the terms of the lease or through the public benefit derived by virtue of the statutory reimbursement, the presumption of validity becomes conclusive. In the absence of an adequate record of such pivotal factual findings, as here, we are unable to determine whether—in fact—the requisite consider-

ation is lacking. Conversely, absent the required showing, the presumption of facial validity is not rebutted and must stand. (*California Housing Finance Agency* v. *Elliott, supra*, 17 Cal.3d 575, 594.)[11]

Since we have earlier concluded that there is no improper use of fuel tax revenues in the acquisition and rental of lands held for future use, a fortiori no constitutional restrictions are imposed upon the long-standing allocation and application of the rental revenues derived from the prudent fiscal management of the unused lands. Indeed, the department would conceivably be liable to a charge of misfeasance in the event it failed to seek and obtain available rentals during such period of dormant use. So long as competitive rentals are obtained, any administrative costs—including rental adjustments—reasonably necessary to accomplish the paramount constitutional purposes would be justified. Accordingly, we find no merit in respondent's alternate contention that the statutory reimbursement and deduction scheme openly conflicts with the provisions of California Constitution, article XIX.

Judgment reversed.

Elkington, J., and Grodin, J., concurred.

---

[11]We reject respondent's ancillary argument that the statutory design reflects an impermissible attempt to afford property tax relief without benefit of an explicit constitutionally based exemption. (See Cal. Const., art. XIII, § 1 et seq.; Rev. & Tax. Code, § 201.) While we recognize that the Legislature is powerless to limit or extend a constitutional grant of exemption (*Pasadena University* v. *Los Angeles Co.* (1923) 190 Cal. 786, 788 [214 P. 868]; *Lucas* v. *County of Monterey* (1977) 65 Cal.App.3d 947, 954 [135 Cal.Rptr. 707]), and possessory leasehold interests remain taxable where the reversion is otherwise exempt, as here, (Cal. Const., art. XIII, § 3, subd. (a); see Rev. & Tax. Code, §§ 104, 107; *People* v. *Shearer* (1866) 30 Cal. 645, 657-661; *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544]; *City of Palo Alto* v. *County of Santa Clara* (1970) 5 Cal.App.3d 918, 921 [85 Cal.Rptr. 544]; *United States of America* v. *County of Fresno* (1975) 50 Cal.App.3d 633, 638-639 [123 Cal.Rptr. 548], affd. 429 U.S. 452 [50 L.Ed.2d 683, 97 S.Ct. 699]; *Mattson* v. *County of Contra Costa* (1968) 258 Cal.App.2d 205, 209-212 [65 Cal.Rptr. 646]), no question of unauthorized exemption is presented. The relief extended under the statute is not from the payment of property taxes, but presumptively from liability for double taxation as an implied condition of the underlying lease agreement. (Cf., *Cane* v. *City and County of San Francisco, supra*, 78 Cal.App.3d 654.) That conclusion is buttressed by the further legislative policy to prevent an unknowing windfall by permitting the lessee to recover damages for the amount of possessory interest tax paid. (See Rev. & Tax. Code, § 107.6.)